IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RON PAGE, MARIE CAIAZZO,
CELESTE GABEL, RUSSELL HEBERT,
CAROLINE KUBIAK, RALEIGH
LINTNER, BRIAN MACINNIS,
RANDY MAPSTON, DEBORAH MILLS,
SHIN TREVOR NALEPA, BEATRIZ
RODRIGUEZ, TIM SMITH, RAYMOND
VIL, and RANDY ZIMMERMANN,
*Individually and on behalf
of those similarly situated*,

               *Plaintiffs*,

v.                                    Civil Action No. _____

NOVA HEALTHCARE MANAGEMENT,
L.L.P., NOVA HEALTHCARE P.A.,
PATIENT TRANSPORT SERVICES, LLC,
ULF ROHDE, GERT ROHDE, BEHROOZE
MEYMAND, and CARRISA BRAY,

               *Defendants*.

## PLAINTIFFS' ORIGINAL COLLECTIVE ACTION COMPLAINT AND JURY TRIAL DEMAND

      Ron Page, Marie Caiazzo, Celeste Gabel, Russell Hebert, Caroline Kubiak, Raleigh

Lintner, Brian MacInnis, Randy Mapston, Deborah Mills, Shin Trevor Nalepa, Beatriz

Rodriguez, Tim Smith, Raymond Vil, and Randy Zimmermann (collectively, "Plaintiffs") bring

this Collective Action Complaint and Jury Trial Demand ("Complaint") on behalf of themselves

and others similarly situated to recover unpaid overtime wages, unpaid commissions, liquidated,

punitive and other damages from their former employers: Defendants Nova Healthcare

Management, L.L.P., Nova Healthcare P.A., Patient Transport Services, LLC, Ulf Rohde, Dr.

Gert Rohde, Behrooze "Bruce" Meymand, and Carissa Bray.

1

## NATURE OF THE SUIT

1.      Defendants have made millions of dollars off the backs of their employees and former employees by requiring them to work long hours, and then willfully depriving them of the overtime and commission they worked so hard to earn, all in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-262 and Texas state laws.

2.      Under the assumed name of "Nova Medical Centers," Defendants Nova Healthcare Management, L.L.P. ("Nova Management"), Nova Healthcare P.A. ("Nova PA"), and Patient Transport Services, LLC ("Nova PTS") operate 25 or more occupational medical and testing facilities in Texas and Georgia.

3.      Plaintiffs worked as Industrial Directors at various Nova Medical Centers around Texas.  To keep from paying overtime, Defendants improperly classified Plaintiffs and other Industrial Directors as exempt from the FLSA's overtime requirement by claiming they were outside salespersons.  Industrial Directors, however, are not outside salespersons, and therefore, they are not exempt because they do not sell any products, nor do they obtain orders or contracts for services.  Plaintiffs and those similarly situated are entitled, therefore, to receive unpaid overtime wages, calculated at one and one-half their regular rate of pay for all hours worked in excess of forty (40) hours in a workweek, an equal amount in liquidated damages, costs, and reasonable attorney's fees under the FLSA.

4.      In addition to willfully depriving Plaintiffs of overtime pay, Defendants engaged in an ongoing scheme to cheat Plaintiffs out of receiving the commission Defendants promised to pay them.  Plaintiffs were promised an uncapped 3% commission on each account they acquired and managed effective immediately upon hire.  However, upon hire Plaintiffs learned that they would be subject to 90-day waiting periods and that they would not be allowed to see the

information needed to determine when and how much commission they earned. While they were still employed with Defendants, Plaintiffs received little, if any, of the commission they earned for acquiring and maintaining accounts. Once Plaintiffs' accounts were well-established, their employment was terminated, and they were not paid for any of the commission they earned during the prior months. Other Plaintiffs grew so frustrated from never receiving the commission they earned that they had no choice but to find other employment. Each of the Defendants personally profited from this scheme. As a result of Defendants' fraud, breach of contract, and other violations of the law, Plaintiffs are entitled to actual damages, exemplary damages, costs, and attorney's fees under the Texas Civil Practice and Remedies Code.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over Plaintiffs' FLSA claims under 28 U.S.C. § 1331 because this lawsuit arises under the laws of the United States, particularly the FLSA, 29 U.S.C. §§ 201-262.

6. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because the Court has original jurisdiction over the FLSA claims, and Plaintiffs' state law claims are so related to the FLSA claims that they form part of the same case or controversy under Article III of the United States Constitution.

7. Venue is proper in this Court under 28 U.S.C. § 1391(a) because all or a substantial part of the events or omissions giving rise to Plaintiffs' claims took place in the Southern District of Texas, Houston Division. Specifically, Defendants' headquarters are in Houston, many of the Plaintiffs were trained in Houston or trained at their respective location with Defendant Bruce Meymand conducting and supervising the training via telephone in

3

Houston, and all personnel decisions including decisions regarding pay, commissions, hiring, and firing were made in Houston.

8.      This Court has personal jurisdiction over Nova Management, Nova PA and Nova PTS because they are Texas corporations with their headquarters at 5771 Enid Street, Houston, Texas 77009, and they each conduct business in Texas.

9.      This Court has personal jurisdiction over Ulf Rohde, Dr. Gert Rohde, Bruce Meymand, and Carissa Bray because they each work in Houston, Texas, and they reside in Bellaire, Houston/Pearland, Houston, and Tomball, respectively.

## THE PARTIES

### *The Plaintiffs*

10.     Plaintiffs were employed as Industrial Directors at various Nova Medical Centers around Texas until Defendants terminated or constructively discharged them. One of the current Plaintiffs spent a short time with the title of "Team Lead." However, as discussed below, Team Leads have the same duties as Industrial Directors. Therefore, for purposes of this Complaint, "Industrial Directors" includes Team Leads unless otherwise noted.

11.     Industrial Directors engage in marketing. In fact, Industrial Directors are often referred to as marketers amongst themselves and by Defendants. Each workday Industrial Directors are required to make cold calls to businesses in an attempt to set up in-person appointments, where they market the services offered by Nova Medical Centers.      Industrial Directors do not market or sell any products, and they to do not obtain contracts or take orders for any of Nova Medical Centers' services. Indeed, no binding commitments are ever signed or otherwise entered into for a business to use Nova Medical Centers' services.

4

12.     Plaintiff Ron Page is a resident of Austin, Texas. Mr. Page worked as an Industrial Director at Nova Medical Centers' Dallas Love Field location from September 2010 to June 2011. In June 2011, Mr. Page became a Team Lead and was transferred to Nova Medical Centers' Austin South location, where he worked until April 2012. Mr. Page's FLSA Consent Form is attached as Exhibit 1.

13.     Plaintiff Marie Caiazzo is a resident of San Antonio, Texas. Ms. Caiazzo worked as an Industrial Director at Nova Medical Centers' San Antonio East and San Antonio Airport locations from January 2012 to April 2012. Ms. Caiazzo's FLSA Consent Form is attached as Exhibit 2.

14.     Plaintiff Celeste Gabel is a resident of Blue Ridge, Texas. Ms. Gabel worked as an Industrial Director at Nova Medical Centers' Mesquite location from October 2010 to March 2011. Ms. Gabel's FLSA Consent Form is attached as Exhibit 3.

15.     Plaintiff Russell Hebert is a resident of Nederland, Texas. Mr. Hebert worked as an Industrial Director at Nova Medical Centers' Beaumont location from September 2011 to June 2012. Mr. Hebert's FLSA Consent Form is attached as Exhibit 4.

16.     Plaintiff Caroline Kubiak is a resident of Fort Worth, Texas. Ms. Kubiak worked as an Industrial Director at Nova Medical Centers' Central Fort Worth location from June 2010 to June 2011. Ms. Kubiak's FLSA Consent Form is attached as Exhibit 5.

17.     Plaintiff Raleigh Lintner is a resident of Katy, Texas. Mr. Lintner worked as an Industrial Director at Nova Medical Centers' East Houston and West Houston locations from October 2010 to April 2011. Mr. Lintner's FLSA Consent Form is attached as Exhibit 6.

18.     Plaintiff Brian MacInnis is a resident of Richardson, Texas.   Mr. MacInnis worked as an Industrial Director at Nova Medical Centers' Plano location from September 2010 until July 2011.  Mr. MacInnis's FLSA Consent Form is attached as Exhibit 7.

19.     Plaintiff Randy Mapston is a resident of Fort Worth, Texas.  Mr. Mapston worked as an Industrial Director at Nova Medical Centers' North Fort Worth location from November 2010 to April 2012. Mr. Mapston's FLSA Consent Form is attached as Exhibit 8.

20.     Plaintiff Deborah Mills is a resident of Mansfield, Texas.  Ms. Mills worked as an Industrial Director at Nova Medical Centers' Grand Prairie location from July 2010 to November 2010.  Ms. Mills's FLSA Consent Form is attached as Exhibit 9.

21.     Plaintiff Shin Trevor Nalepa is a resident of Austin, Texas.  Mr. Nalepa worked as an Industrial Director at Nova Medical Centers' Austin North location from January 2012 to June 2012. Mr. Nalepa's FLSA Consent Form is attached as Exhibit 10.

22.     Plaintiff Beatriz Rodriguez is a resident of Houston, Texas.   Ms. Rodriguez worked as an Industrial Director at Nova Medical Centers' Post Oak Houston and West Houston locations from January 2011 to February 2012.   Ms. Rodriguez's FLSA Consent Form is attached as Exhibit 11.

23.     Plaintiff Tim Smith is a resident of Irving, Texas.   Mr. Smith worked as an Industrial Director at Nova Medical Centers' Dallas Love Field location from February 2011 to October 2011. Mr. Smith's FLSA Consent Form is attached as Exhibit 12.

24.     Plaintiff Raymond Vil is a resident of Arlington, Texas.   Mr. Vil worked as an Industrial Director at Nova Medical Centers' Central Fort Worth location from June 2010 to May 2012.  Mr. Vil's FLSA Consent Form is attached as Exhibit 13.

6

25.     Plaintiff Randy Zimmermann is a resident of Plano, Texas. Mr. Zimmermann worked as an Industrial Director at Nova Medical Centers' Plano location from June 2010 to October 2011. Mr. Zimmermann's FLSA Consent Form is attached as Exhibit 14.

**The Class**

26.     Those who are similarly situated to Plaintiffs consist of all current and former Industrial Directors and Team Leads who worked for or who currently work at Nova Medical Centers in Texas and Georgia, who were not paid time and one-half for each hour worked in excess of forty (40) per workweek (collectively, "the Class").

**The Defendants**

27.     Defendants Nova Management, Nova PA, and Nova PTS operate occupational medical and testing facilities in Texas and Georgia under the assumed name, "Nova Medical Centers." Nova Medical Centers have facilities and employees in the Houston, Beaumont, Dallas, Fort Worth, Austin, and San Antonio areas, as well as in Atlanta, Georgia. Nova Medical Centers have expanded or will be expanded by the end of the year 2012 to at least four other Texas locations, including El Paso, Waco, Corpus Christi, and an additional San Antonio facility.

28.     Each of Nova Medical Centers' facilities provides occupational medical and testing services to employees and prospective employees of businesses, including drug and alcohol screening, audiometry, vision, physicals, functional capacity evaluations, pulmonary function testing, respiratory fit testing, diagnoses, treatment and plans for occupational injuries, x-ray services, minor emergency care, rehabilitation, physical therapy, modified duty and transitional work programs, injury prevention programs, back schools, and train the trainer programs. Nova Medical Centers allow walk-ins. Advanced appointments are never required. The employee only needs to walk in with an authorization form completed by his or her

7

employer and some form of identification. If an employee needs transportation, Nova Medical Centers will provide transportation to and from the facilities. Payments for all of these services are primarily made by workers' compensation insurers, although a few employers self-pay.

29. At each of Nova Medical Centers' facilities, Industrial Directors, Physicians, Physical Therapists, other treatment providers, Patient Transporters, and all other employees work under the same roof and have the same shared services. Nova Management performs all administrative, personnel, payroll, billing, and collecting functions for itself as well as for Nova PA and Nova PTS. All job advertisements for Physicians, Physical Therapists, Patient Transporters, and Industrial Directors and the Defendants' website only mention "Nova Medical Centers."

30. All revenue generated from Nova PA and Nova PTS is paid to Nova Management. When paychecks are distributed to employees, the checks reflect payments from Nova PA for Physicians and other licensed professionals, from Nova PTS for transportation drivers, and from Nova Management for the other employees, including Industrial Directors. However, all 401(k) contributions for Nova Management, Nova PA, and Nova PTS employees are made to the same plan, the "Nova Healthcare Management, L.L.P. 401K Salary Reduction Plan and Trust." The Form 5500 filed by the plan administrator, Defendant Carissa Bray, states that it is a single employer plan.

31. Defendant Nova Management is a Texas limited liability partnership, doing business within the State of Texas with its principal place of business, its headquarters, and all its personnel and payroll functions at 5771 Enid, Houston, Texas 77009. At all relevant times, Nova Management had gross revenues in excess of $500,000 per annum. At all relevant times, Nova Management has been and continues to be an employer engaged in interstate commerce

and/or the production of goods for interstate commerce and/or its employees engaged in activities that are closely related and directly essential to the production of goods for interstate commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a). At all relevant times, Nova Management was Plaintiffs' employer and is legally responsible for the unlawful conduct, policies, practices, acts and omissions as described in this Complaint.

32.     Defendant Nova PA provides occupational medical services and testing to patients in Nova Medical Centers' facilities. Nova PA is a Texas professional association, doing business within the State of Texas with its principal place of business, its headquarters, and all its personnel and payroll functions at 5771 Enid, Houston, Texas 77009. Dr. Gert Rohde serves as the registered agent for and is the sole member of Nova PA. At all relevant times, Nova PA was Plaintiffs' joint employer and is legally responsible for the unlawful conduct, policies, practices, acts and omissions as described in this Complaint. Nova PA maintained significant operational control over the day-to-day operations of Nova Management, directly or indirectly, by participating in and making decisions on the following: (a) hiring and firing of all employees at all levels including Industrial Directors; (b) supervising and controlling employee work schedules and all conditions of employment, including disciplining employees, setting work hours, requiring Industrial Directors to work overtime, and not paying them time and one-half for the overtime worked; (c) determining the rate and method of payment, including setting the amounts for salaries, bonuses, commissions, and incentive pay, and refusing to pay commissions; and (d) maintaining employment records, including personnel, payroll, insurance, tax and commission records.

33.     Defendant Nova PTS provides transportation to and from Nova Medical Centers' facilities. Nova PTS is a Texas limited liability company, doing business within the State of

Texas with its principal place of business, its headquarters, and all its personnel and payroll functions at 5771 Enid, Houston, Texas 77009. Nova Management is the registered agent and sole managing member of Nova PTS. At all relevant times, Nova PTS was Plaintiffs' joint employer and is legally responsible for the unlawful conduct, policies, practices, acts and omissions as described in this Complaint. Nova PTS maintained significant operational control over the day-to-day operations of Nova Management, directly or indirectly, by participating in and making decisions on the following: (a) hiring and firing of all employees at all levels including Industrial Directors; (b) supervising and controlling employee work schedules and all conditions of employment, including disciplining employees, setting work hours, requiring Industrial Directors to work overtime, and not paying them time and one-half for the overtime worked; (c) determining the rate and method of payment, including setting the amounts for salaries, bonuses, commissions, and incentive pay, and refusing to pay commissions; and (d) maintaining employment records, including personnel, payroll, insurance, tax and commission records.

34. Defendant Ulf Rohde is an individual who resides in Bellaire, Texas. Mr. Rohde is the President and Chief Executive Officer of Nova Management and a member of Nova Management's Executive Leadership Team. At all relevant times, Mr. Rohde was Plaintiffs' joint employer and is legally responsible for the unlawful conduct, policies, practices, acts and omissions as described in this Complaint. Mr. Rohde maintained significant operational control over the day-to-day operations of Nova Management, directly or indirectly, by participating in and making decisions on the following: (a) hiring and firing of all employees at all levels including Industrial Directors; (b) supervising and controlling employee work schedules and all conditions of employment, including disciplining employees, revising and approving employee

10

policies, setting work hours, requiring Industrial Directors to work overtime, and not paying them time and one-half for the overtime worked; (c) determining the rate and method of payment, including setting the amounts for salaries, bonuses, commissions, and incentive pay, and refusing to pay commissions; and (d) maintaining employment records, including personnel, payroll, insurance, tax and commission records.

35.     Defendant Bruce Meymand is an individual who resides in Houston, Texas. Mr. Meymand is the Vice President of Nova Management and a member of Nova Management's Executive Leadership Team. At all relevant times, Mr. Meymand was Plaintiffs' joint employer and is legally responsible for the unlawful conduct, policies, practices, acts and omissions as described in this Complaint.   Mr. Meymand maintained significant operational control over the day-to-day operations of Nova Management, directly or indirectly, by participating in and making decisions on the following: (a) recruiting, hiring, training, firing, and disciplining all levels of employees including Industrial Directors; (b) supervising and controlling employee work schedules and all conditions of employment, including setting work hours, requiring Industrial Directors to work overtime, and not paying them time and one-half for the overtime worked; (c) determining the rate and method of payment, including setting the amounts for salaries, bonuses, commissions, and incentive pay, and refusing to pay commissions; and (d) maintaining employment records, including personnel, payroll, insurance, tax, and commission records.

36.     Defendant Dr. Gert Rohde, who is Ulf Rohde's brother, is an individual who resides in Houston, Pearland, and Dallas Texas. Dr. Rohde is the Chief of Staff and sole member of Nova PA. Dr. Rohde is a member of Nova Management's Executive Leadership Team. At all relevant times, Dr. Rohde was Plaintiffs' joint employer and is legally responsible for the

unlawful conduct, policies, practices, acts and omissions as described in this Complaint. Dr. Rohde maintained significant operational control over the day-to-day operations of Nova Management, directly or indirectly, by participating in and making decisions on the following: (a) hiring and firing of all employees at all levels including Industrial Directors; (b) supervising and controlling employee work schedules and all conditions of employment, including disciplining employees, setting work hours, requiring Industrial Directors to work overtime, and not paying them time and one-half for the overtime worked; (c) determining the rate and method of payment, including setting the amounts for salaries, bonuses, commissions, and incentive pay, and refusing to pay commissions; and (d) maintaining employment records, including personnel, payroll, insurance, tax and commission records.

37.     Defendant Carissa Bray is an individual who resides in Tomball, Texas. Ms. Bray is the current Chief Financial Officer and former Human Resources Director of Nova Management, the Plan Administrator for the Nova Healthcare Management, L.L.P. 401K Salary Reduction Plan and Trust, and a member of Nova Management's Executive Leadership Team. At all relevant times, Ms. Bray was Plaintiffs' joint employer and is legally responsible for the unlawful conduct, policies, practices, acts and omissions as described in this Complaint. Ms. Bray maintained significant operational control over the day-to-day operations of Nova Management, directly or indirectly, by participating in and making decisions on the following: (a) hiring and firing of employees, including Industrial Directors; (b) supervising employee work schedules and all conditions of employment, including disciplining employees, setting work hours, classifying Industrial Directors as exempt, and not paying Industrial Directors time and one-half for the overtime worked; (c) determining the rate and method of payment, including setting the amounts for salaries, bonuses, commissions, and incentive pay, and refusing to pay

12

commissions; and (d) maintaining employment records, including personnel, payroll, 401(k), insurance, tax and commission records.

38.     Nova Management, Nova PA, and Nova PTS are joint enterprises or alter egos of one another because the group: (a) has an express or implied agreement between each of the businesses as to running Nova Medical Centers; (b) a common purpose to be carried out by the group, which is providing medical, testing, and transportation services in Nova Medical Centers; (c) a community of pecuniary interest in that common purpose; (d) has an equal right to a voice in the direction of the whole enterprise, which gives an equal right of control to each member of the group; and (e) has such a unity that the separateness of each entity has ceased to exist, and holding only Nova Management liable, and not holding Nova PA and Nova PTS liable, would be unjust.

39.     Nova Management is the alter ego of the Ulf Rohde, Dr. Gert Rohde, Bruce Meymand, and Carissa Bray.  Mr. Rohde, Dr. Rohde, Mr. Meymand, and Ms. Bray used Nova Management for the purpose of perpetrating and did in fact perpetrate a fraud on Plaintiffs, as set forth herein, primarily for their own direct personal benefits.  The Defendants are so united that Nova Management's separateness as an entity has ceased to exist, and holding only Nova Management liable, and not holding Mr. Rohde, Dr. Rohde, Mr. Meymand, and Ms. Bray liable, would be unjust.

### FLSA FACTUAL ALLEGATIONS

40.     Plaintiffs each worked as Industrial Directors at various Nova Medical Centers including Houston, Beaumont, Dallas, Fort Worth, Austin and San Antonio and the surrounding areas, until they were each terminated or constructively discharged by Defendants.

13

41.     Each of the Plaintiffs were interviewed (in person, over the phone, via videoconferencing, or via Skype), hired, and trained by a member of the Executive Leadership Team, but primarily by Bruce Meymand.  The Executive Leadership Team, which includes Ulf Rohde (President and CEO), Dr. Gert Rohde (Chief of Staff), Bruce Meymand (Vice President), and Carissa Bray (CFO), participated in or contributed to each of Plaintiffs' terminations or constructive discharges.  In fact, all business and personnel decisions about Nova Management, Nova PA, and Nova PTS (including hiring, firing, promotions, pay, bonus, commission, and benefit decisions) are made at headquarters in Houston, Texas, by the Executive Leadership Team.

42.     As Industrial Directors, Plaintiffs did not engage in work that falls within any of the exceptions or exemptions listed in 29 U.S.C. § 213(a)(1) or any other provision of the FLSA that would render them exempt from receiving overtime at the rate of one and one-half times the regular rate of pay for all hours worked in excess of forty (40) in a workweek.

43.     The primary responsibility of an Industrial Director is to market the services of Nova Medical Centers. This entailed them making cold calls to businesses, setting up in-person appointments, and then providing the businesses with general information and marketing material about Nova Medical Centers in the hopes that the business will one day send an employee to use one of Nova Medical Centers' facilities.  Industrial Directors do not obtain orders, contracts, or other binding commitments from the businesses for Nova Medical Centers' services or for the use of the facilities.  Industrial Directors do not engage in the sale, exchange, contract to sell, consignment for sale, shipment for sales or other disposition of any product. Industrial Directors simply provide businesses with general information about Nova Medical

14

Centers' services.  Indeed, Industrial Directors have been instructed to "just introduce Nova's services and move on to the next appointment."

44.     Regardless of what happens at an in-person appointment, and regardless of whether a business actually sends an employee to use Nova Medical Centers, that business is under no obligation whatsoever at any time to send any employee to Nova Medical Centers.  In fact, a business could send employees to Nova Medical Centers, while at the same time sending employees to one of Nova Medical Centers' competitors, or never use Nova Medical Centers at all.

45.     If a business sends an employee to use any of Nova Medical Centers' services, the services are usually paid by workers' compensation insurers, although some businesses, who are workers' compensation non-subscribers, may self-pay.

46.     Industrial Directors were not treated like typical outside salespersons.  Industrial Directors were not only required to "punch a time clock" by logging into a computer each day, but also every aspect of their job was controlled and supervised.  For example, Industrial Directors were told who to call, when to call, what to say during cold calls, from where to make cold calls, when to make in-person appointments, what to say at appointments, how long to stay at an appointment, how often to send email marketing material, what time of day to send emails, and when to do background research.

47.     Industrial Directors had no control over what they could do in the morning.  Each Monday through Friday from 8:30 a.m. to 11:00 a.m., Industrial Directors are required to make cold calls to businesses in an attempt to set up meetings.  Industrial Directors were not allowed to make cold calls from home.  Industrial Directors were required to physically come into their respective office location, log into their computers by 8:30 a.m. and make their first call by 8:45

a.m. Industrial Directors have been repeatedly instructed to start cold calls on time and to "not do anything else but calls from 8:45-11:00." If an Industrial Director were to log in late, he or she would be subject to discipline, and a red light on the computer would blink repeatedly for the remainder of the morning. Industrial Directors were required to make 30-45 cold calls by 11:00 a.m. each morning. Failure to do so could result in discipline up to and including termination. The number of cold calls placed per day was monitored by a computerized call log.

48.     Industrial Directors would be disciplined if they did anything else except make cold calls in the morning, even if they needed to do something directly pertaining to acquiring or maintaining an account. For example, Industrial Directors were instructed to not send emails to anyone during the morning call time and to not even call or talk to peers or management for business related matters. In at least one meeting, Defendant Bruce Meymand instructed Industrial Directors to sign a document confirming that they would not do anything except make cold calls in the morning, and they were warned that violating the policy would subject them to discipline.

49.     Industrial Directors were restricted as to who they could call because they could only call businesses in the territory assigned to them, even if the territory was primarily residential. Territories were sometimes changed without notice or explanation, or accounts within a territory were simply taken away from an Industrial Director and given to someone else.

50.     Industrial Directors were given a detailed script to read, which they were required to follow for each cold call. The script included a two column table, where one column listed common objections that businesses make to using Nova Medical Centers, and how to answer each objection. Industrial Directors were not allowed to change the core message of this script, nor did Industrial Directors have any input in creating the core message.

16

51.     Industrial Directors had little, if any, control over their in-person appointment schedule.  Each weekday between 11:00 a.m. and 5:00 p.m., Industrial Directors were required to have at least two in-person appointments per day.  Industrial Directors were instructed not to spend too much time at any one appointment, and have even been disciplined for spending "too much time on one account."  Industrial Directors were prohibited from meeting with businesses from 8:30 a.m. to 11:00 a.m. without prior approval.

52.     By 5:00 p.m. each day, Industrial Directors were required to enter information into the "CRM" computer program, including who they saw, at what businesses location, what time they saw them, and what was said.  The CRM also served as a "time clock" to monitor whether Industrial Directors were punching in late (after 8:30 a.m.) or punching out early (before 5:00 p.m.).

53.     Although "office hours" were 8:30 a.m. to 5:00 p.m., Industrial Directors were required to work more than forty hours per workweek.  Because Industrial Directors were prohibited from researching business leads from 8:30 a.m. to 5:00 p.m., they had to conduct all background research on companies before or after office hours or on weekends.  In fact, during their initial training sessions, Industrial Directors were specifically informed that "all researching and entering of companies should occur on your own time and not during business hours."  Researching the 30-45 companies they were supposed to cold call each morning could easily take over 3 hours per night to complete.

54.     At least one hour a night, Industrial Directors were required to attend "Nova U" (short for "Nova University"), an online training module on how to market Nova Medical Centers' services.  Industrial Directors were prohibited from attending Nova U between 8:30

17

a.m. and 5:00 p.m.  Attendance at Nova U was monitored through a report generated from the computer program that logged in the day and time of attendance of each Industrial Director.

55.     Industrial Directors are not required to exercise discretion or independent judgment with respect to matters of significance.  Defendants strictly control every aspect of Industrial Directors' work including what to do, when and where to do it, what to say, how to say it, and even how many cold calls to make.  Indeed, a failure to strictly follow policies and procedures has resulted in discipline up to and including termination.

56.     Even Industrial Directors who are given the title of "Team Lead" are not required to exercise discretion or independent judgment with respect to matters of significance.   Team Leads have no real authority to hire, as their hiring decisions, if any, could be and often were overturned by anyone on the Executive Leadership Team for any reason.  Team Leads had no authority whatsoever to fire employees or make any other personnel or business decisions of significance.  All personnel and business decisions are made by the Executive Leadership Team, who then tells the Team Lead exactly what to tell to the Industrial Directors at their respective locations.  Indeed, other than serving as a liaison between corporate and the various locations, a Team Lead has the exact same duties as Industrial Directors.

57.     Despite their regular performance of these non-exempt duties, Industrial Directors, including those with a title of "Team Lead," were misclassified as exempt from the FLSA's overtime requirements.  Defendants' failure to pay them overtime at a rate of one and one-half time their regular rate of pay for all hours worked in excess of forty per workweek violated the FLSA.

## FLSA COLLECTIVE ACTION ALLEGATIONS

58.     Defendants have violated the FLSA by failing to pay overtime, not only to Plaintiffs, but also to the Class.  Plaintiffs each have worked at various Nova Medical Centers throughout Texas, and they each have firsthand knowledge that all members of the Class have the same non-exempt duties Plaintiffs had and that the members of the Class were not paid overtime.  The members of the Class were subject to the same written and verbal policies and practices as Plaintiffs because the Executive Leadership Team makes all business and personnel decisions for all Nova Medical Centers, and all Industrial Directors were subject to the same employee policy and practices regardless of location.  Like the Plaintiffs, the members of the Class have or had primarily non-managerial, non-outside sales duties, were classified as exempt under the FLSA from receiving overtime, and did not receive overtime pay to which they were entitled.

59.     The pattern or practice of failing to pay Industrial Directors overtime as required by the FLSA is a generally applicable policy or practice and does not depend on the individual circumstances of the Class members.  Thus, Plaintiffs' experiences as Industrial Directors are typical of the experiences of the Class.

60.     All Industrial Directors, including Team Leads, who were denied overtime compensation for hours worked in excess of forty (40) in a workweek are similarly situated to Plaintiffs.  Although the issue of damages may be individual in character, there is no detraction from the common nucleus of liability facts.  Accordingly, the Class is properly defined as follows:

> All current and former Industrial Directors and Team Leads who
> worked at any of Nova Medical Centers' locations at any time

during the time period of July 11, 2009 to the present, who were

denied overtime compensation in the amount of one and one-half

times their regular rate of pay for all hours worked in excess of

forty (40) in a workweek.

61.     Defendants' policy or practice of refusing to pay Industrial Directors overtime compensation in the amount of time and one-half for all hours worked in excess of forty (40) hours in a workweek was and is in violation of the FLSA.

62.     Plaintiffs and all those similarly situated are entitled to be paid overtime in the amount of one and one-half times their regular rate of pay for each hour they have worked in excess of forty (40) per workweek.

63.     Upon information and belief, Defendants acted knowingly, willfully, or with reckless disregard in refusing to pay Plaintiffs overtime. Defendants knew or should have known that their policies and practices violated the FLSA, and they have not made a good faith effort to comply with the FLSA.

64.     Plaintiffs and the Class also are entitled to an amount equal to all their unpaid wages as liquidated damages, as well as reasonable attorney's fees and costs.

## STATE LAW FACTUAL ALLEGATIONS

65.     Defendants not only refused to pay Plaintiffs overtime, but also refused to pay Plaintiffs the commission they were promised.

66.     In applying for and agreeing to work as Industrial Directors, Plaintiffs relied in part on Defendants' online advertisements. On websites such as Monster.com and Indeed.com, Defendants, under the assumed name of "Nova Medical Centers," advertised that they would pay Industrial Directors a "lucrative base salary + commissions," and further offered, "High earning

20

potential - $100K+ Income Potential; Unlimited income earning potential; Aggressive commission structure with residual payments and no cap." In more recent online advertisements, Nova Medical Centers claim an earning potential of "$150K+" for Industrial Directors.

67.     In their offer letters, Plaintiffs were promised a base salary of between $45,000 to $53,000 per year, plus "an uncapped 3% commission calculated on collection for those accounts that you acquire and manage. This commission structure extends Company wide [sic] for all services performed and does not include a 'Sunset Clause.' The aforementioned compensation schedule becomes effective upon the first day of work and shall continue for the duration of continuous, full-time employment."

68.     Based on the representations made in the job advertisements and in the offer letters, Plaintiffs agreed to work for Defendants in exchange for the base salary and commission they were promised.

69.     Upon hire, Plaintiffs were not given the commission they were promised. Rather than the commission becoming effective immediately, a 90-day or longer waiting period was imposed before Plaintiffs were eligible for commission.   Plaintiffs also were told that commission would not be paid until the last paycheck of the following month after the payments were collected.

70.     Plaintiffs were not allowed to get the financial information they needed to determine how much Defendants collected on Plaintiffs' accounts. Plaintiffs, therefore, were unable to determine exactly how much commission they were supposed to receive and when. Plaintiffs were informed that if they asked the executives or management for such information, they would be terminated. In fact, Plaintiffs were informed in person and in the employee

handbook that questioning, complaining, or talking about their own or anyone else's salary, commission, or other terms or conditions of their employment would result in termination.

71.     Defendants engaged in a scheme to "churn and burn" Plaintiffs and other Industrial Directors and to keep the commission.  Defendants would intentionally hire an excess number of Industrial Directors to saturate the market and raise the profile of Nova Medical Centers—a practice that executives bragged about in front of Plaintiffs.  Once an account became or was beginning to become lucrative, Plaintiffs were terminated, or the account was taken away from them directly, or indirectly through rezoning of the territories.  Some Plaintiffs grew so frustrated with working long hours while receiving little, if any, of the commission they earned that they had no choice but to find other work.  In many cases, Plaintiffs were terminated within four months—the first month of commission eligibility after the 90-day waiting period expired or just before they were to receive their last paycheck of the month.

72.     Upon information and belief, hundreds of Industrial Directors have been and are being victimized by this "churn and burn" scheme in which Defendants fire or constructively discharge Industrial Directors to cheat them out of commission.

## CAUSES OF ACTION

### FLSA Collective Action

73.     Plaintiffs allege and incorporate by reference the preceding paragraphs of this Complaint as if fully alleged herein.

74.     Defendants violated the FLSA by misclassifying Plaintiffs as exempt outside sales employees, and by not paying them overtime in the amount of one and one-half the time of their regular rate of pay, even though Plaintiffs were not employed in the capacity of outside salespersons, and primarily performed non-exempt work.

22

75.     Defendants' actions were willful and intentional, and therefore, a three-year statute of limitations applies to such violations, pursuant to the FLSA, 29 U.S.C. § 255.

76.     Defendants' willful and intentional violation of the FLSA is a widespread pattern and practice that not only affected Plaintiffs, but also the Class, as defined herein.

77.     Defendants have not made a good faith effort to comply with the FLSA with respect to the compensation of Plaintiffs and the Class.

78.     Defendants' violation of the FLSA has caused Plaintiffs and the Class to suffer damages in the amount of their earned but unpaid overtime wages calculated in accordance with the FLSA.

79.     As a result of Defendants' unlawful acts, Plaintiffs and the Class have been deprived of overtime compensation in amounts to be determined at trial, and are entitled to recover such amounts, and an amount equal to their unpaid wages as liquidated damages, as well as reasonable attorney's fees and costs and other compensation under the FLSA, 29 U.S.C. § 216(b).

80.     Defendants are joint employers of Plaintiffs and the Class, and each of them is jointly and severally liable for their violation of the FLSA.

### Breach of Contract

81.     Plaintiffs allege and incorporate by reference the prior allegations of this Complaint as if fully alleged herein.

82.     Plaintiffs and Defendants had a valid and enforceable contract.  In exchange for Plaintiffs' services, Defendants made written offers to pay Plaintiffs a base salary plus the following: "an uncapped 3% commission calculated on collection for those accounts that you acquire and manage. This commission structure extends Company wide [sic] for all services

performed and does not include a 'Sunset Clause.' The aforementioned compensation schedule becomes effective upon the first day of work and shall continue for the duration of continuous, full-time employment." Plaintiffs each accepted the offer by signing the offer letter where indicated, which appears in the offer letter as follows:

Accepted:_____ Date: _____
                 Name

83.     Plaintiffs performed or tendered performance by working for Defendants and acquiring and managing accounts that were eligible for commission and on which Defendants were able to collect.

84.     Defendants breached the contract by failing to pay Plaintiffs commissions due and owed to Plaintiffs, by failing to pay 3% commission for the accounts Plaintiffs acquired and managed, by failing to pay commission on a company-wide basis for all services Plaintiffs performed, by failing to pay commission effective upon each Plaintiff's first day of work, and by taking away accounts Plaintiffs acquired and maintained without paying them commission earned on those accounts.

85.     Defendants further breached the agreement by withholding monthly revenue, collections, or other financial reports to keep Plaintiffs from ascertaining how much and when commissions were due.

86.     Defendants' breaches have caused Plaintiffs injury in the amount of earned, but unpaid commission.

87.     For Defendants' breaches, Plaintiffs are entitled to actual damages, and reasonable attorney's fees under Texas Civil Practice and Remedies Code § 38.001(1)-(2) and (8) because Plaintiffs' claims are for rendered services, performed labor, and an oral or written contract.

24

88.     Defendants are joint employers, joint enterprises, and/or alter egos and each of them is jointly and severally liable for this unlawful conduct.

### Common Law Fraud

89.     Plaintiffs allege and incorporate by reference the prior allegations of this Complaint as if fully alleged herein.

90.     Defendants represented to Plaintiffs that Plaintiffs would receive a base salary plus an uncapped 3% commission on accounts Plaintiffs acquired and managed for all services performed company-wide effective upon the first day of work and continuing for the duration of continuous, full-time employment. Defendants represented that Plaintiffs had the potential to make a total compensation of $100,000 to $150,000 per year.

91.     Defendants' representations regarding commissions were material. Receiving commission was an important reason for Plaintiffs to not only accept a job, but also to work well in excess of forty (40) hours per workweek in order to maximize the amount of commission they thought they were going to receive.

92.     Defendants made false statements of fact to Plaintiffs that were untrue, deceptive, or misleading concerning past or present facts. Specifically, Defendants hired Plaintiffs knowing of Defendants' past and present pattern or practice of hiring an excessive number of Industrial Directors to saturate the market, taking away accounts, and terminating or constructively discharging Industrial Directors without ever paying them all the commissions they earned.

93.     Defendants also made false statements of opinions to Plaintiffs that Defendants knew were false, that were based on or supported by Defendants' false statement of facts, or that were based on Defendants' specialized knowledge, and Defendants should have known that Plaintiffs were justified in relying on Defendants' specialized knowledge. To the extent

25

Defendants claim they were expressing a mere opinion that Plaintiffs had the potential of making $100,000 to $150,000 per year, Defendants knew that the opinion was false or based on false statements of fact, as set forth in the previous paragraphs. Defendants further had specialized knowledge about the amount of commission prior Industrial Directors earned and were actually paid, and Defendants should have known that Plaintiffs were justified in relying on Defendants' specialized knowledge about the potential for earning commission. At the time of these misrepresentations, Defendants had specialized knowledge that they had no future intention of paying Plaintiffs the commissions they earned.

94.     Defendants made false promises of future performance. Defendants made false promises to Plaintiffs that Plaintiffs would receive a base salary plus an uncapped 3% commission on accounts Plaintiffs acquired and managed for all services performed company-wide effective upon the first day of work and continuing for the duration of continuous, full-time employment. Defendants made these promises with no intention of performing.

95.     Defendants made false representations by their conduct in concealing the information needed for Plaintiffs to know when and how much commission they actually earned, and threatening them with termination if they asked for the information.

96.     Defendants made the aforementioned statements, opinions, promises, and representations knowing they were false.

97.     Defendants intended that Plaintiffs act in reliance on the aforementioned statements, opinions, promises, and representations or had reason to expect that Plaintiffs would do so. Plaintiffs incurred pecuniary loss in the amount of unpaid but earned commissions.

98.     Plaintiffs justifiably relied on and agreed to work based on these the aforementioned statements, opinions, promises, and representations to their detriments.

99.     Defendants' wrongful conduct constitutes common law fraud under Texas law.

100.     Plaintiffs are entitled to actual damages and exemplary damages under Texas Civil Practice and Remedies Code § 41.003(a)(1).   Plaintiffs are also entitled to recover reasonable attorney's fees under Texas Civil Practice and Remedies Code § 38.001(1)-(2) and (8) because Plaintiffs' claims are for rendered services, performed labor, and an oral or written contract.

101.     Defendants are joint employers, joint enterprises, and/or alter egos and each of them is jointly and severally liable for this unlawful conduct.

### Promissory Estoppel

102.     Plaintiffs allege and incorporate by reference the prior allegations of this Complaint as if fully alleged herein.

103.     Defendants promised Plaintiffs a base salary plus the following: "an uncapped 3% commission calculated on collection for those accounts that you acquire and manage. This commission structure extends Company wide [sic] for all services performed and does not include a 'Sunset Clause.'  The aforementioned compensation schedule becomes effective upon the first day of work and shall continue for the duration of continuous, full-time employment."

104.     Plaintiffs reasonably and substantially relied on these promises to their detriments by working over forty (40) hours per workweek, expecting to receive commission that Defendants had no intention of paying.  Plaintiffs have been injured in the amount of earned, but unpaid commission.

105.     Plaintiffs' reliance was foreseeable by Defendants because the commission requirements are spelled out in the offer letters.

106.     Injustice can only be avoided by enforcing Defendants' promises.

27

107. As a result of Defendants' actions, Plaintiffs are entitled to actual damages and reasonable attorney's fees under Texas Civil Practice and Remedies Code § 38.001(1)-(2) and (8) because Plaintiffs' claims are for rendered services, performed labor, and an oral or written contract.

108. Defendants are joint employers, joint enterprises, and/or alter egos and each of them is jointly and severally liable for this unlawful conduct.

## Quantum Meruit/Unjust Enrichment

109. Plaintiffs allege and incorporate by reference the prior allegations of this Complaint as if fully alleged herein.

110. Plaintiffs provided services to Defendants that benefited Defendants. Defendants accepted Plaintiffs' services by hiring Plaintiffs to work, knowing Plaintiffs would be acquiring and managing accounts, and making no objection to Plaintiffs doing so.

111. Defendants knew that Plaintiffs expected to be paid commission for their services before Plaintiffs were ever hired because the offer letters detail how much commission Plaintiffs were to receive and the terms and conditions of receiving commission.

112. Because Defendants denied Plaintiffs commission that was rightfully owed to them, and kept the commission, Defendants have been unjustly enriched.

113. Plaintiffs are therefore entitled to actual damages.

114. Plaintiffs also are entitled to recover reasonable attorney's fees under Texas Civil Practice and Remedies Code § 38.001(1)-(2) and (8) because Plaintiffs' claims are for rendered services, performed labor, and an oral or written contract.

115. Defendants are joint employers, joint enterprises, and/or alter egos and each of them is jointly and severally liable for this unlawful conduct.

### Theft of Service – Texas Theft Liability Act

116.    With intent to avoid payment for services that Defendants knew that Plaintiffs were providing only in exchange for monetary compensation, Defendants intentionally and knowingly secured performance of Plaintiffs' services by deception, threat, or false token.

117.    Defendants intentionally or knowingly secured the performance of Plaintiffs' services by agreeing to provide compensation and, after Plaintiffs rendered their services, Defendants failed to make full payment after receiving notice demanding payment.

118.    By these actions, Defendants committed theft of Plaintiffs' services.

119.    Plaintiffs are therefore entitled to actual damages, and attorney's fees under Texas Civil Practice and Remedies Code § 38.001(1)-(2) and (8) because Plaintiffs' claims are for rendered services, performed labor, and an oral or written contract.

120.    Defendants are joint employers, joint enterprises, and/or alter egos and each of them is jointly and severally liable for this unlawful conduct.

### Civil Conspiracy

121.    Plaintiffs allege and incorporate by reference the prior allegations of this Complaint as if fully alleged herein.

122.    Defendants had a meeting of the minds and came to an agreement to deprive Plaintiffs of commission they earned, acted upon that agreement by committing fraud, breach of contract and other unlawful overt acts, as set forth in this Complaint, and Plaintiffs suffered damages (commission and overtime) as the proximate result.

123.    Defendants' unlawful actions therefore constitute a civil conspiracy, and Defendants are jointly and severally liable for Plaintiffs' state law claims.

## ATTORNEY'S FEES

124.    Plaintiffs allege and incorporate by reference the prior allegations of this Complaint as if fully alleged herein.

125.    As a result of Defendants' wrongful actions, Plaintiffs have engaged the undersigned law firm and agreed to pay it reasonable attorney's fees and expenses incurred in prosecuting this lawsuit.

126.    For the FLSA claims, Plaintiffs seek recovery of attorney's fees under 29 U.S.C. § 216(b).

127.    For the state law claims, Plaintiffs seek recovery of attorney's fees and expenses under Texas Civil Practice and Remedies Code § 38.001(1)-(2) and (8) because Plaintiffs' claims are for rendered services, performed labor, and an oral or written contract.

128.    All conditions precedent have been performed or have occurred for Plaintiffs to recover attorney's fees.

## DEMAND FOR TRIAL BY JURY

129.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all questions of fact raised by the Complaint.

## PRAYER FOR RELIEF

130.    WHEREFORE, for the FLSA claims, Plaintiffs respectfully request that judgment be entered in their favor, awarding them and all similarly situated employees:

> a.  Overtime wages for all unpaid hours worked in excess of forty (40) hours in a workweek, at the rate of one and one-half (1½) times their regular rate of pay;
>
> b.  An equal amount as liquidated damages as allowed under the FLSA;
>
> c.  An injunction against future violations of the FLSA;

    d.  Reasonable attorney's fees, cost, and expenses of this action as provided by the FLSA;

    e.  Prejudgment and post-judgment interest; and

    f.  Such other and further relief as may be required by law.

131.    For the state law claims, Plaintiffs respectfully request that judgment be entered in their favor, awarding them:

    a.  Actual damages, including all earned but unpaid commission;

    b.  Exemplary damages;

    c.  Reasonable attorney's fees, cost, and expenses of this action as provided by Texas Civil Practice and Remedies Code § 38.001(1)-(2) and (8);

    d.  Prejudgment and post-judgment interest; and

    e.  Such other and further relief as may be required by law.

Respectfully submitted,

/s/ Liquita Lewis Thompson
Liquita Lewis Thompson
Texas Bar No. 24005831
S.D. Bar No. 27634
Lewis Thompson Law, PC
19747 Hwy 59 North, Suite 460
Humble, Texas 77338
Telephone: (832) 644-5299
Facsimile:  (832) 644-5524

ATTORNEY-IN-CHARGE FOR
PLAINTIFFS